UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

MARIA S. DELOUISE                                    CIVIL ACTION

VERSUS

IBERVILLE PARISH SCHOOL                              NO.: 11-00587-BAJ-RLB
BOARD, DR. EDWARD CANCIENNE,
INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY, MELVIN
LODGE, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY, AND GEORGE
GRACE, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY

RULING AND ORDER

Before the Court is a **Motion for Partial Summary Judgment (Doc. 35)**, filed by the Iberville Parish School Board ("IPSB"), Dr. P. Edward Cancienne, and Melvin Lodge, seeking dismissal of certain claims filed against them pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, the First Amendment, the Fourteenth Amendment, Louisiana Revised Statutes 23:967. State law claims for the intentional infliction of emotional distress are also alleged. The motion is opposed (Doc. 41) by Plaintiff Maria Delouise ("Plaintiff"). Oral argument is not necessary. Jurisdiction is proper under 28 U.S.C. § 1331.

I.    Background

Plaintiff, a Caucasian female, began her employment with the IPSB as a Librarian in August 2006 (Doc. 1, ¶ 4). Beginning in July 2008, Plaintiff was

assigned to the position of Assistant Principal of East Iberville School located in St. Gabriel, Louisiana. She was then promoted to Acting Principal at the same school in August 2008 (Doc. 35-1, at 2). In March 2010, Plaintiff alleges that she was approached by Cancienne, Superintendent of Iberville Parish Schools, and told that she was being "demoted" and transferred to Plaquemine High School because of her race (Doc. 1, ¶ 9). Plaintiff asserts that Ms. Chris Weaver, Educational Consultant hired by IPSB, witnessed the conversation, and that Cancienne told her such a transfer and demotion had nothing to do with her job performance, but that "[t]hey want a [B]lack principal." *Id.*

Plaintiff claims to have learned that Lodge, and George Grace, former Mayor of St. Gabriel, pressured Cancienne to suggest the change to the IPSB. Cancienne denies Plaintiff's allegation. Cancienne asserts that no such conversations occurred with Plaintiff, Lodge, or Grace. Cancienne alleges that Plaintiff was transferred because of poor performance in her role as Principal (Doc. 35-1, at 4). Nevertheless, on April 12, 2010, IPSB voted to reassign Plaintiff to "Principal of Special Projects" before the school year concluded, and to transfer her to Plaquemine High School once the school year ended (Doc. 1, ¶ 10). Plaintiff's transfer took place on June 1, 2010 (Doc. 1, ¶ 11). Michael Eskridge, an African American male, was selected to serve as principal at East Iberville School (Doc. 16-1, ¶ 10).

Plaintiff asserts that the position she held at Plaquemine High School was in name only and was far inferior to her position as Principal. Also, Plaintiff claims that, after the IPSB voted for her transfer, she was unfairly placed on an Intensive

2

Assistance Plan ("the Plan") as the result of an unsatisfactory performance evaluation conducted for the 2009-2010 school year. Plaintiff was to remain on the Plan until January 13, 2011 (Doc. 35-1, at 6). Plaintiff refutes the reasons for being placed on the Plan, and asserts that the proper policies pertaining to her duties were not followed and that she was not given the opportunity to rectify any alleged deficiencies (Doc. 1, ¶ 12). In December 2010, Plaintiff took a temporary position as "Acting Principal" of Plaquemine High School because of a requested transfer by the former Principal. *Id.* ¶ 13.   On March 22, 2011, during her time as Acting Principal at Plaquemine High School, Plaintiff filed a charge against IPSB with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination. Thereafter, on May 3, 2011, Plaintiff alleges that she was informed that she would be demoted to Librarian as a result of a reduction in force. She allegedly inquired of the reason for the demotion, but alleges she was told that IPSB was not required to give her a reason.[1] Plaintiff also interviewed for the position of Executive Master Teacher ("EMT") in May 2011, a position which she alleges was promised to her by Cancienne and others. However she was denied the position, and asserts that the position was given to a less qualified applicant, who is a Caucasian female (Doc. 1, ¶ 15, Doc 35-1, at 8-9).

---

[1] Plaintiff makes this claim in her Complaint; however, she does not specifically identify the person who gave her this information (Doc. 1, ¶ 14). However, in her letter to the EEOC, she asserts that Mr. Cavalier made the statement (Doc. 35-3, at 46).

3

On May 9, 2011, IPSB voted to demote Plaintiff to Librarian. Plaintiff alleges that Cancienne, Lodge, Grace, the City, and the IPSB knew that Plaintiff had filed a charge with the EEOC and that the EEOC filing formed the basis of her demotion. *Id.* ¶ 14. However, IPSB denies that its members had any knowledge of the EEOC filing at the time Plaintiff was notified of her demotion because the notification letter was allegedly sent to the wrong address (Doc. 35-1, at 7).[2] IPSB contends that Plaintiff was demoted because Chief Academic Officer, Elvis Cavalier, reported that Plaintiff failed to properly manage the school's finances and create an environment of academic excellence when she took over as Acting Principal at Plaquemine High School. *Id.* at 9. Cavalier further recommended that Plaintiff's contract not be renewed by the IPSB. According to the terms of Plaintiff's contract, in the event of nonrenewal, she was to be transferred to the last position in which she was tenured, which was Librarian. *Id.* at 10. Plaintiff was subsequently transferred to White Castle High School. Plaintiff filed the instant suit on August 24, 2011, alleging various claims of discrimination and retaliation against her. She resigned her position as Librarian at White Castle High School in October 2011.

In the instant Motion, the Defendants assert that Plaintiff's claims against them for retaliation and reprisal under federal and state law are unfounded and/or untimely, as they were not aware of her EEOC claim at the time the decision was

---

[2] The Defendants assert that, on March 30, 2011, the EEOC attempted to send a Notice of Charge of Discrimination to Brandie Blanchard, Director of Personnel. However, the Notice was sent to an incorrect address in Norwood, Louisiana. The Defendants assert that the IPSB does not have an office there nor does it receive mail at this location (Doc. 35-1, at 7).

made to transfer and demote her. They also assert that Plaintiff is not entitled to punitive damages, that her claims against Cancienne and Lodge are duplicative of her claims against the IPSB, and that her claims for the intentional infliction of emotional distress are untimely (Doc. 35). Plaintiff, however, contends that all of her claims are timely, are supported by strong factual claims in her Complaint, and therefore do not warrant summary judgment (Doc. 41).

## II.   Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in her favor. *Coleman v. Houston Independent School District*, 113, F.3d 528 (5th Cir. 1997). After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The non-movant's burden, however, is not satisfied by some metaphysical doubt as to the material facts, or by conclusory allegations, unsubstantiated assertions or a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

III.   **Analysis**

A.   **Retaliation and Reprisal Claim under 42 U.S.C. § 1981, First Amendment and Fourteenth Amendment Claims**

The Defendants contend that there is no genuine dispute as to whether any of them knew of Plaintiff's EEOC charge when she was denied the EMT position or when her contract was not renewed, thus Plaintiff has no retaliation claim under Section 1981 (Doc. 35-1, at 16). Plaintiff, however, asserts that she notified several IPSB members and employees that she had filed a charge with the EEOC and, before she even filed the charge, she "engaged in opposition conduct by complaining about the racial discrimination to Dr. Cancienne, IPSB members and IPSB employees" (Doc. 41, at 18).[3] Plaintiff further alleges that her First Amendment and Fourteenth Amendment rights were violated because she engaged in protected speech by speaking out against the retaliation in the manner of speaking to IPSB employees and filing an EEOC claim, and because her due process rights were violated when she was treated differently than similarly situated individuals (Doc. 41, at 22-23).

Section 1981 "is designed to include a federal remedy against discrimination in employment on the basis of race." *Adams v. McDougal*, 695 F.2d 104, 108 (5th Cir. 1983) (citing *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459-60 (1975)). The Fifth Circuit "considers claims of intentional discrimination, which include racial

---

[3] The Defendants contend that the Court should not give credence to Plaintiff's alleged informal complaints to members and employees of the School Board because such claims were not raised in the Complaint (Doc. 48-3, at 4).

discrimination and retaliation claims based on Title VII and 42 U.S.C. § 1981, under the same rubric of analysis." *Raggs v. Mississippi Power and Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002). Title VII makes it unlawful for an employer to retaliate against an employee who opposes any employment practice made unlawful by Title VII. See 42 U.S.C. §2000e-3(a).

To make a *prima facie* case of retaliation under Title VII, Plaintiff must show: (1) that she engaged in an activity protected by Title VII, (2) that her employer took an adverse employment action against her; and (3) that a causal link existed between the protected activity and the adverse action. *Hernandez v. Yellow Transportation, Inc.*, 670 F.3d 644, 657 (5th Cir. 2012); *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007); *Raggs*, 278 F.3d at 471. "[F]or purposes of a retaliation cause of action, the adverse employment action requirement is not limited to hiring, granting leave, discharging, promoting or compensating, but may encompass any challenged action that a reasonable employee may consider materially adverse...." *Arsendorf v. Snow*, 2006 WL 3302532, at *14 (S.D. Tex. 11/13/06), citing *Burlington Northern & Santa Fe Railway v. White*, 126 S.Ct. 2405 (2006).

Moreover, "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in §2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2533 (2013). "[A]

plaintiff making a retaliation claim ... must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 2334. As such, a plaintiff's retaliation claim will fail if retaliation is only one motivating factor among others for the employment decision.[4]

If a plaintiff proves her *prima facie* case of retaliation, the burden shifts to the defendant to demonstrate a legitimate, non-retaliatory purpose for the employment action. *McCoy,* 492 F.3d at 557. "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." *Id.* If a defendant satisfies this burden, plaintiff must prove that the employer's stated reason for the adverse action is not true but instead is a pretext for the real retaliatory purpose. *Id.*

Based on the evidence presented, the Court must conclude that Plaintiff's demotion is not sufficiently related to the filing of the EEOC claim. Cancienne testified that he made up his mind to recommend Plaintiff's transfer to Principal of Special Projects at Plaquemine High School in January 2011 (Doc. 41-5, at 12, Cancienne Dep.). Based on Plaintiff's performance, Cancienne had concluded that Plaintiff effectively managed the curriculum, but that she was not managing the school finances, and she failed to foster a sense of community at the school (Doc. 41-5, at 18, Cancienne Dep.). Cancienne asserts that he gave Plaintiff the option to transfer or to step down as Principal at East Iberville School during their conversation in March 2011 (Doc. 41-5, Cancienne Dep.). Plaintiff maintains that

---

[4] As Defendants assert, and the Court agrees, "plaintiff cannot prevail if retaliation is only one motivating factor among other motivations for the decision" (Doc. 54, at 2).

racial reasons were provided by Cancienne for her transfer during the March 2011 conversation, and that a witness was present during the conversation (Delouise Dep.).[5]

Nevertheless, according to other testimony, Cancienne's concerns with Plaintiff's performance were not unfounded. Personnel Supervisor Robert Daigle, who evaluated Plaintiff during her time at East Iberville beginning in December 2007, noted that Plaintiff tried very hard to direct the school and was successful in some areas, even with minimal support staff. However, he also acknowledged that Plaintiff exhibited deficiencies in management, that she was not properly trained, and that there had been complaints against Plaintiff (Doc. 41-14, at 16-18). In his written evaluation, Daigle outlined several areas where Plaintiff needed improvement (Doc. 41-14, Daigle Dep.).

Similar concerns were communicated by Educational Consultant Christine Weaver, who also evaluated Plaintiff while she was Principal at East Iberville School. In her testimony, Weaver acknowledged that Cancienne was concerned with Plaintiff's performance at East Iberville School and desired to assist her with her duties (Doc. 41-15, at 12-13). Weaver also acknowledged that she initially felt the

---

[5] Plaintiff claims that Christine Weaver witnessed the conversation and that she heard Cancienne tell Plaintiff that her transfer was because of the color of her skin (Delouise Dep.). Weaver testified, however, that she was not actually present for the entire conversation and walked in to hear Cancienne say something along the lines of Plaintiff "was the wrong color" (Doc. 41-15, at 19, Weaver Dep.). She also testified that she did not hear any of Cancienne's statements before that or after the alleged statement was made, as she was not present, and that she was in the office for less than a minute. *Id.* Cancienne denies that any conversation about Plaintiff's race took place. *See* Cancienne Dep. Nonetheless, the accuracy of any such statement is not controlling on the issues in this case, given than the Defendants have provided overwhelming evidence supporting their stated actions taken on Plaintiff's employment.

concerns were legitimate based on observations of Plaintiff making negative comments about the high school teachers (Doc. 41-15, at 13).

To be sure, Weaver acknowledged that Plaintiff exhibited a willingness to cooperate and remedy the deficiencies, and like Daigle, Weaver noted that Plaintiff lacked support staff. Nevertheless, Weaver noted many of the same deficiencies that Daigle found, and on one occasion, reported that, in the context of scheduling, Plaintiff "knows nothing about high school" (Doc. 41-15, at 14). She also admitted reporting that she found tension among the staff as a whole, and that Plaintiff was "the weakest of the three" principals Iberville had at the time (Doc. 41-15, at 15-17). IPSB member Nancy Broussard testified that she believed race played a factor in Plaintiff's transfer, but that Cancienne had expressed concerns with Plaintiff's performance at East Iberville School even in the year prior to the transfer (Doc. 41-8, at 4). Moreover, Broussard admitted that in late spring 2009, Cancienne had expressed concerns with Plaintiff's mercurial relationship with faculty members at the school, describing it as calm one day and volatile the next (Doc. 41-8, at 8).

In support of her position, Plaintiff offered the testimony of several school board employees including Charles Johnson, Janet Marrioneaux, Darlene Ourso, and Brian Willis, all of whom supposedly attested to the allegation that Cancienne wanted to have a black principal at East Iberville School (See Doc. 41, Exhibits). She directs the Court to the testimony of Response to Intervention Coordinator Erin Gross, who believes Plaintiff was transferred because of her race and because of internal favors within the school system (Doc. 41-12). Gross recalled statements

made by Cancienne that he felt "pressured" to get a black principal at East Iberville School (Doc. 41-12, at 12-14). However, Gross acknowledges that Plaintiff had problems at East Iberville School, that Plaintiff's performance as principal was questioned, and that she had heard that Plaintiff was "tough on teachers" and held expectations that were "hard for them to handle" (Doc. 41-12, at 9-11, Gross Dep.). She also acknowledged that Cancienne expressed his concerns about Plaintiff's competence and effectiveness six months to even a year before the transfer (Doc. 41-12, at 10). Further, although she worked closely with Cancienne at least several times a week, Gross could not say when Cancienne had made up his mind to recommend Plaintiff's transfer, and she did not know if Cancienne had other reasons for wanting to transfer Plaintiff (Doc. 41-12, at 14-15).

The Defendants also submitted evidence of the evaluations of Plaintiff's performance from her time at East Iberville School until the end of her time at Plaquemine High School. The first was conducted in June 2010 by Cancienne (Doc 35-6). The evaluation reflects Plaintiff's performance for the 2009-2010 school years, and it is indicative of Plaintiff's need for significant improvements in certain areas of her duties. Indeed, Plaintiff was placed on the Plan as a result of having three areas of "Needs Improvement" on this evaluation (Doc. 35-6, at 35).[6] Plaintiff's next evaluation was conducted in June 2011 by Cavalier, who was in charge of evaluation

---

[6] There is some dispute as to how an employee is placed on the Plan. Plaintiff contends that a "warning system" is a feature of the procedure and that the employee is entitled to an opportunity to correct any deficiencies before being placed on the Plan. The Defendants, however, insist that Plaintiff was required to be placed on the Plan because she had three areas of "Needs Improvement."

and development of principals. Cavalier was charged with evaluating Plaintiff while she was Acting Principal at Plaquemine High School (Doc. 35-10, Cavalier Affidavit). Thus, his observations of Plaintiff's performance began before her written evaluation was conducted. Cavalier stated that he visited Plaquemine High School at least twice a week while Plaintiff was in charge and, from the time she took over, "she struggled with management of the school" (Doc. 35-10, at 2). Further, his sworn affidavit provided that:

> [s]he failed to create a culture of academic excellence, she did not effectively manage the finances of the school, and she was unfair and inconsistent in the treatment of faculty and staff at PHS. I observed that [Plaintiff] focused too much on the minutia of relational issues at the school. And she did not focus her time and energy on the main issues facing the school. She failed to develop a fiscal plan for the school and made no effort to raise money for the school. At the end of her tenure as principal, the PHS football program was in debt for tens of thousands of dollars. I also received complaints that [Plaintiff] was unfair and unprofessional in disciplining staff and faculty at PHS.

(Doc. 35-10, at 2-3). Cavalier asserts that he recommended Plaintiff's contract not be renewed to Cancienne in spring 2011, and that the time of the recommendation he had no knowledge of an EEOC claim. Based on the recommendation provided by Cavalier, and on his own observations, Cancienne recommended nonrenewal of Plaintiff's contract to the IPSB. The IPSB voted to not renew the contract in May 2011.

The Defendants further provided evidence of the interview evaluations conducted of the candidates for the EMT position in 2011, as well as the résumés for Plaintiff and Allison Junot, the candidate who was eventually chosen. Although

Plaintiff insists that she was promised but not given the position because of her EEOC claim, the documentary evidence shows that she scored lower than Junot in her interviews by all three committee members, and that Junot, a white female, was better qualified for the position (Doc. 35-4, Blanchard Exhibits, Doc-35-10, Cavalier Exhibits, Doc. 35-10, Miller Exhibits). Plaintiff has not presented evidence to refute the scores, nor is there evidence to support the assertion that any of the three committee members who conducted the interviews knew about the EEOC claim.

There is little evidence to show that *anyone* knew about the EEOC claim. Affidavits from Tom Delhaye, Paul Distefano, Albertha Hasten, Michael Hebert Jr., Glyna Kelley, Melvin Lodge, Freddie Molden, Brian Willis, Pam George, Donald Patterson, Michael Barbree, and Nancy Broussard, all of whom are voting board members of the IPSB, assert that they had no knowledge of Plaintiff's EEOC claim at the time her contract was not renewed (Doc. 35, Exhibits). Human Resources Personnel Brandie Blanchard submitted an affidavit asserting that she had no knowledge of an EEOC claim. EMT committee member Alnita Miller submitted an affidavit asserting that she had no knowledge of an EEOC claim. Elementary Curriculum Supervisor Geralyn Callegan, who Plaintiff claims knew of her discontent due to racial bias, testified that she had no knowledge of the EEOC claim before the filing of this lawsuit (Doc. 41-10, at 9). Janet Marrioneaux testified that she recalled hearing something about an EEOC claim, but could not articulate who, what, when, where, or how she had heard the comment (Doc. 41-9, at 10). Erin Gross's testimony reflects knowing about Plaintiff's frustrations in her employment

with the school system, but there is no mention of her knowing about the EEOC claim (See Doc. 41-12). Darlene Ourso could not remember when she heard Plaintiff's EEOC claim was filed (See Doc. 41-11).

Based on the evidence presented, the Court must conclude that Plaintiff cannot make a *prima facie* case of retaliation against the Defendants. Simply, Plaintiff cannot establish a *but-for* causal link between the adverse employment action and the protected activity necessary to succeed on this claim. Assuming that there was any measure of retaliation against Plaintiff, which the evidence does not support, the Defendants have convinced the Court that Plaintiff would have been demoted, regardless of the filing of her EEOC charge, because of a long period of unsatisfactory performance in the positions she held. More importantly, the Court has yet to find any witness who knew of the EEOC claim before the demotion. Plaintiff has provided unsubstantiated evidence, mostly through her own testimony, alleging retaliation by the Defendants because of the filing of her claim. Yet, she fails to show how any actions taken by Cancienne, Lodge, or the IPSB were the result of any specific retaliatory conduct. Although Plaintiff refutes claims of unsatisfactory performance, the record reveals that the Superintendent and other evaluating personnel found her performance to be unsatisfactory on numerous occasions.

Regarding the EMT position, Plaintiff has not shown that there was a promise to give her the EMT position, or that she did not get the position due to the filing of the EEOC claim. The Defendants have provided credible documentary evidence showing that Plaintiff was not given the job because the ISPB eventually hired a

more qualified applicant. The evidence shows that, at the time the interviews were conducted, Plaintiff scored lower than another qualified applicant. Plaintiff has not provided any substantiated proof that a "promise" was made to her by anyone, nor that her *not* getting the position was the result of an EEOC claim. Moreover, the EMT committee members who conducted the interview (including Blanchard, Cavalier, and Miller) had no authority over Plaintiff's employment with the IPSB, as none were voting members of the IPSB. No evidence has been offered to show that Cancienne, whom Plaintiff claims conspired against her from the very beginning, had any dealings with the actual decision process of the committee and served only as the go-between of the EMT committee and the IPSB.

To the extent that there was discussion about Plaintiff possibly being available to perform the duties of an EMT, such a discussion is not a promise. What appears to be the case here is that Plaintiff interpreted such a discussion of the position, whether it was related to the salary or otherwise, as a binding commitment that the job was hers. It is uncontested that Cancienne spoke to Plaintiff about possibly filling the position. It is also certain that at some point, Blanchard and Plaintiff discussed the salary for the position and that Plaintiff was told she would not be paid the same amount as she would make as a Principal. However, Plaintiff does not provide any evidence supporting why she believed the job was hers. Also, she fails to provide or refer to any contract, acknowledgement, note, email, phone message, or other evidence to support this claim. Further, she fails to direct the Court to a policy or custom of the IPSB supporting her assertion that undocumented

promises of employment are binding.

Most importantly, the Defendants have provided uncontroverted evidence of Plaintiff's employment contract with the school system, which gives the IPSB the exclusive right to transfer, demote, or terminate Plaintiff at its discretion (Doc. 35-3, at 41-44). Plaintiff claims that she was told her demotion was the result of a reduction in force, but that she was actually demoted because of her EEOC claim. There is no evidence to support Plaintiff's contention that she was told she was part of a reduction in force, and she has failed to point to evidence to support her claim that her demotion was part of the reduction. The Defendants firmly assert that the nonrenewal of Plaintiff's contract was already in place due to her poor performance, and that her appearance in the minutes of the meeting was because "[t]he nonrenewal was included in the expenditure reduction plan because it saved ... personnel costs ..." (Doc. 48-3, at 10).

Nevertheless, *assuming arguendo*, that there was evidence that Plaintiff was told she was part of a reduction in force, Plaintiff cannot establish a but-for causal link for her demotion to satisfy a retaliation claim here. *See University of Texas Southwestern Medical Center v. Nassar, supra.* Plaintiff's contract states:

IX.   REDUCTION IN FORCE: DURING TERM OF CONTRACT

Notwithstanding any other provision of this contract to the contrary, should it become necessary for the School Board to effect a reduction in force, Appointee shall be subject to the provisions of the reduction in force policy of the School Board as it presently exists or as that policy may hereafter be amended. If application of the reduction in force policy causes Appointee to be removed from the position covered hereunder, then this agreement shall automatically

16

> terminate and Appointee shall be treated under the reduction in
> force policy as though he/she was occupying the last position in the
> school system in which he/she has acquired tenure. If application
> of the reduction in force policy requires reassignment of
> Appointee to a position of lesser rank and/or dignity than that
> specified herein, then Appointee will not receive the compensation
> set forth herein, but, instead, will receive only that salary ordinarily
> paid to an individual of like qualifications and experience in the lesser
> position.

(Doc. 35-3, at 44.) According to the documents provided by the Defendants,[7] Plaintiff

knew that she was subject to a possible reduction in force, should the IPSB find one

necessary. Thus, in the event Plaintiff was told she was part of a reduction in force,

Plaintiff's allegations would still lack merit, as the IPSB has the right to make the

necessary changes required by a reduction (Doc. 35-6).

Also, Plaintiff has not proven that the IPSB employees she allegedly told

about the discrimination told any other IPSB members. Accordingly, the Court finds

it unnecessary to address Plaintiff's First Amendment retaliation claim because it

cannot independently find that the right to any protected speech could have been

breached. Similarly, the Court cannot find that Plaintiff was treated differently than

similarly situated individuals to support a Fourteenth Amendment claim. Since

Plaintiff does not specifically identify any individuals she was treated differently

from, or how those individuals were treated, the Court also finds it unnecessary to

offer a long discussion on this claim.

Of those who had voting privileges with IPSB, and who claimed to know of the

discrimination and retaliation against Plaintiff, only IPSB member Darlene Ourso

---

[7] Plaintiff's signature appears on the contract in acknowledgement of its terms. (Doc. 35-3, at 44.)

voted against Plaintiff's transfer and demotion. However, Ourso has also made unsubstantiated allegations of hostility against other board members, and she has exhibited uncertainty regarding her recollection of the events connected with this lawsuit (Doc. 41-11, at 4-6). Both Nancy Broussard and Brian Willis, IPSB members who admitted to having knowledge of Plaintiff's discontentment, voted to transfer and demote Plaintiff. Each testified that they had no knowledge of the EEOC claim when it was filed, or at the time they voted on Plaintiff's employment.

The employer's burden is only one of production in retaliation cases and involves no credibility assessment. *McCoy, supra.* However, the Court is satisfied with the reasons and evidence that the Defendants have provided concerning why Plaintiff was demoted. The Court is also satisfied that they lacked knowledge of Plaintiff's EEOC claim. Consequently, Plaintiff's claim fails as a matter of law. The Motion for Partial Summary Judgment on this claim is granted.

**B. La. R.S. § 23:967 Claim**

The Louisiana Whistleblower Statute provides protection to employees against reprisal from employers for reporting or refusing to participate in illegal work practices. *Beard v. Seacoast Elec., Inc.*, 06-1244 (La. App. 4 Cir. 1/24/07), 951 So. 2d 1168 (La. Ct. App. 2007); *Accardo v. Louisiana Health Services & Indem. Co.,* 05-2377 (La. App. 1 Cir. 6/21/06), 943 So. 2d 381 (La. Ct. App. 2006). The Whistleblower Statute provides, in pertinent part:

> A. An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:

(1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.

(2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.

(3) Objects to or refuses to participate in an employment act or practice that is in violation of law.

*** 

C. For the purposes of this Section, the following terms shall have the definitions ascribed below:

(1) "Reprisal" includes firing, layoff, loss of benefits, or any discriminatory action the court finds was taken as a result of an action by the employee that is protected under Subsection A of this Section; however, nothing in this Section shall prohibit an employer from enforcing an established employment policy, procedure, or practice or exempt an employee from compliance with such.

La. R.S. § 23:967.

Louisiana courts generally agree that the employer must have committed an actual violation of state law. *Beard*, 951 So.2d at 1170; *Accardo*, 943 So.2d at 387; *Hale v. Touro Infirmary,* 2004–0003 (La. App. 4 Cir. 11/3/04), 886 So.2d 1210, *writ denied,* 2005–0103 (La.3/24/05), 896 So.2d 1036; *Puig v. Greater New Orleans Expressway Comm'n,* 2000–924 (La. App. 5 Cir. 10/31/00), 772 So.2d 842, *writ denied,* 2000–3531 (La.3/9/01), 786 So.2d 731; *Diaz v. Superior Energy Services LLC,* 341 Fed. App'x 26 (5th Cir. 2009). Therefore, under La R.S. § 23:967 a plaintiff must prove an actual violation of state law, not just a good faith belief that a law was broken. *Corley v. Louisiana ex rel. Div. of Admin., Office of Risk Mgmt.*, 816 F. Supp. 2d 297, 313-14 (M.D. La. 2011); *Scott v. Turner Indus. Group, LLC*, CIV.A. 09-872, 2011 WL 5023840 (M.D. La. Oct. 19, 2011).   Other than this difference, the standards governing claims under the Louisiana Whistleblower statute and Title VII

19

retaliation claims are materially indistinguishable. *Sprull v. City of Baton Rouge*,
2012 WL 2426793, at *2 (M.D. La. 6/26/12); *Strong v. Univ. Healthcare Sys., L.L.C.*,
482 F.3d 802, 805 (5th Cir. 2007); *Scott v. Turner Indus. Group, LLC*, CIV.A. 09-872,
2011 WL 5023840 (M.D. La. Oct. 19, 2011).[8]

The Court has already articulated its reasons for dismissing retaliation claims
against the Defendants. Because Title VII retaliation claims and the Louisiana
Whistleblower statute are similarly analyzed, the Court finds it unnecessary to
conduct a separate analysis. Therefore, the Motion for Partial Summary Judgment
on this claim is granted.

### C. Section 1981 Claims against the Individual Defendants in their Individual Capacities

The Defendants further assert that the Section 1981 claims against
Cancienne and Lodge, in their individual capacities, are unsupported, as established
by the Fifth Circuit's ruling in *Oden v. Oktibbeha County*, 246 F.3d 458 (5th Cir.
2001) (Doc. 35-1, at 21).[9]  In *Oden*, the Fifth Circuit dismissed all claims against a
sheriff in his individual capacity because they found that his decision regarding the
plaintiff's employment was made in his official capacity and that he was therefore
not liable in his individual liability. Because Cancienne and Lodge acted in their

---

[8] The Fifth Circuit has noted that, to preclude summary judgment against a reprisal claim, the
plaintiff has to create a genuine dispute regarding whether: (1) a defendant violated state law by a
prohibited workplace act or practice; (2) the plaintiff advised the defendant in good faith of the
violation; (3) the plaintiff then refused to participate in, or threatened to disclose, that practice; and (4)
she was subjected to a reprisal as a result of the refusal or threat. *LaRavia v. Cerise*, 11-30035, 2012
WL 573380 at *464 (5th Cir. Feb. 22, 2012).

[9] The Defendants also direct the Court to *Felton v. Polles*, 315 F.3d 470, 480 81 (5th Cir. 2002).

official capacities when they made decisions concerning Plaintiff's employment, the Defendants contend that they are not the proper parties to be sued.

Plaintiff, however, contends that the Defendants' are misinformed by asserting *Oden* as the "bright-line rule," and that "the Fifth Circuit analyzes the facts on a case-by-case basis to determine if the public officials were sufficiently involved in the discriminatory act so as to be held personally liable under Section 1981" (Doc. 41, at 13-14). Plaintiff relies on the decision of *Knox v. Monroe*, 551 F. Supp.2d 504 (W.D. La. Mar. 12, 2008), in which the Court held that the plaintiff's supervisor could be held liable in his individual capacity under Section 1981, as he was the decision maker for the City and essentially controlled her employment status.[10]

This Court will decline to accept the *Knox* ruling, as "[t]he Fifth Circuit has not yet decided whether a plaintiff has a cause of action under § 1981 against an individual defendant." *Celestine v. Aaron Rents, Inc.*, 2007 WL 2703133, at *1 (W.D. La. Sept. 17, 2007) (citing *Felton v. Polles*, 315 F.3d 470, 480-81 (5th Cir. 2002)). It "has suggested situations in which § 1981 liability may lie against individual defendants." *Id.*, citing *Foley v. University of Houston Sys.*, 355 F.3d 333, 338 n. 7 (5th Cir. 2003). The decisions of the Fifth Circuit have varied on a case-by-case basis. See *Faraca v. Clements*, 506 F.2d 956 (5th Cir. 1975); *Bellows v. Amoco Oil Co.*, 118 F. 3d 268 (5th Cir. 1997); *Oden v. Oktibbeha County*, 246 F.3d 458 (5th Cir. 2001);

---

[10] Ultimately, the plaintiff's Section 1981 claim against the supervisor in Knox was denied, but on other grounds.

*Felton v. Polles*, 315 F.3d 470 (5th Cir. 2002); *Foley v. University of Houston Sys.*, 355 F.3d 333 (5th Cir. 2003). The only definitive conclusion reached by the Fifth Circuit on this issue, however, is that "Section 1981 liability will lie against an individual defendant if that individual is 'essentially the same' as the State for purposes of the complained-of-conduct." *Felton*, 315 F.3d at 481. Nevertheless, there is no particular set of facts that determines the liability of an official in his individual capacity.

The Court is not persuaded by the argument of either party. The cases cited are distinguishable from the facts presented here. The Defendants are correct in asserting that the sheriff in *Oden* was not found liable in his individual capacity. However, *Oden* addressed a situation where the plaintiff's Section 1981 claim was not properly asserted through Section 1983. See *Oden, supra*. Such is not the case here, and Plaintiff is correct in asserting that *Oden* does not represent a bright-line rule. Plaintiff, on the other hand, would have this Court to find that the determination in *Knox* is analogous to the facts presented here. However, *Knox* involved a situation where the supervisor actually possessed the authority to fire employees. See *Knox, supra*. Based on the evidence presented here, Plaintiff has not shown that either Cancienne or Lodge possessed the requisite independent authority to demote Plaintiff on their own, nor that either is "essentially the same" as the School Board for purposes of Section 1981 liability.

The evidence reveals that, at the times Plaintiff's position came before the IPSB, Cancienne could only make recommendations to the IPSB, and could not effectively remove anyone on his own (Doc. 35, Exhibits, Doc. 41, Exhibits, Doc. 35-5,

at 15, Daigle Deposition). In fact, he was not authorized or empowered to do so. In his testimony, Cancienne firmly stated that he had no authority to terminate or employ any person (Doc. 35-8, at 3). Cancienne was not a member of the IPSB and could not vote for Plaintiff's transfer or demotion (Doc. 35-6). Thus, even as Plaintiff's "immediate supervisor," he is not the type of supervisor contemplated by Section 1981 under the "essentially the same" principle, because Cancienne exercised little control over Plaintiff's employment beyond recommendations.[11]

Plaintiff claims that Cancienne exercised significant influence over the board members and how they voted (Doc. 41, at 7). Yet, Plaintiff has not pointed to any facts in the record to support this. Even if it could be shown that the IPSB members typically voted according to Cancienne's recommendations, the members themselves exercised the final judgment over Plaintiff's employment. Obviously, it is logical that the members would find merit in the recommendations of the Superintendent, as it is his job to supervise the actions of employees that the members cannot observe for themselves. Absent evidence of improper motives, practices, or policies, however, the Court will not impose its judgment for that of the Superintendent of a school district, based on unsubstantiated accusations.

It was within Cancienne's discretion to make assessments of Plaintiff's performance. He was also within his discretion to recommend that Plaintiff be

---

[11] The Supreme Court has defined the term "supervisor" in Title VII employment discrimination cases as "[a]n employee [who] for purposes of vicarious liability under Title VII . . . is empowered by the employer to take tangible employment against the victim." *Vance v. Ball State University*, --- U.S. ---, 133 S.Ct. 2434, 2454 (2013). The Fifth Circuit has previously established that Section 1981 claims are analyzed under the same framework as Title VII claims. *Raggs*, *supra*. Thus, the Court finds it appropriate to apply the same definition here.

transferred, and later demoted, when he concluded that she was not suitable for the position that she held.[12]

Regarding Lodge, Plaintiff claims that he influenced Cancienne to have her "demoted" because he wanted a black principal at East Iberville School (Doc. 41, at 15). She further alleges that he took part in having her demoted to the position of Librarian. Yet, Plaintiff has not pointed to any evidence to show how Lodge could accomplish such employment decisions on his own. In the documents provided to the Court, the evidence establishes that, in the two IPSB meetings in which Plaintiff's employment was discussed, there was a majority vote to affect her employment each time (Doc. 35-6). At the April 2010 meeting, which transferred Plaintiff to the position of Principal of Special Projects at Plaquemine High School, there was a ten (10) to four (4) vote in favor of the transfer, with Lodge being one of ten. At the May 2011 meeting, Plaintiff's demotion to librarian was accomplished by an eleven (11) to three (3) vote, with one abstention. Once again, Lodge was one of eleven votes to approve the demotion. Plaintiff has not provided evidence indicating that Lodge exercised improper influence over the other voting members of IPSB.

Thus, the Court cannot find any genuine dispute of fact in these allegations. Plaintiff has not shown that Cancienne or Lodge is "essentially the same" under the Fifth Circuit standard in a Section 1981 claim. Moreover, Cancienne and Lodge have provided sufficient evidence to show that decisions they made regarding Plaintiff's

_____

[12] The Court recognizes that the Superintendent's job description has changed regarding recommendations. However, at the time of Plaintiff's employment, the Superintendent only had the power to recommend action to the Board.

employment were made while they were acting in their official capacities. The
Motion for Partial Summary Judgment on this claim is GRANTED, and all claims
against Cancienne and Lodge in their individual capacities are dismissed.

### D. Prescription of 1985 claims

The Defendants argue that Plaintiff's § 1985 claim has prescribed, as Plaintiff
is subject to a one-year delictual tort action statute governed by Louisiana law, and
therefore should be prevented from asserting this claim against any of them.
Plaintiff, however, asserts that her Section 1985 claim is timely under this statute
and that she is entitled to a four-year prescriptive period applied under Section 1983
actions.

The text of § 1985 does not include a codified prescriptive period. 42 U.S.C. §
1985. Accordingly, in adjudicating § 1985 claims, federal courts have traditionally
applied the state law prescriptive period that would govern an analogous tort law
cause of action. *Mitchell v. Crescent River Port Pilots Ass'n,* 265 F. App'x 363, 367
(5th Cir. 2008); *Helen v. Clements,* 832 F.2d 332, 334 (noting that §§ 1981, 1983,
1985, and 1988 are analogous to state tort actions); *Lagarde v. City of New Orleans,*
2012 WL 4482981, *3 (E.D. La. 9/28/2012) (providing that Louisiana's one-year
prescriptive period for delictual actions applies to §§ 1983 and 1985 claims). In 1990,
however, Congress enacted legislation which provides a four-year prescriptive period
for those causes of action arising out of federal statutes enacted after December 1,
1990. 28 U.S.C. § 1658(a). Therefore, whether to apply a one-year or a four-year
prescriptive period in this case turns on whether Plaintiff's § 1985 cause of action

arises under a federal statute enacted after December 1, 1990. *Mitchell v. Crescent River Port Pilots Ass'n,* 265 F. App'x 363 (5th Cir. 2008).

Standing alone, § 1985 does not qualify for the four-year prescriptive period as it was enacted before 1990. However, courts have recognized that § 1985 does not independently create substantive rights; it merely provides a civil cause of action when "some otherwise defined federal right-to equal protection" is breached by a conspiracy. *Great American Federal Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 376 (1979).

In interpreting a similar remedial statute, namely 42 U.S.C. § 1983, courts have suggested that determining the prescriptive period requires the overarching statute to adopt the prescriptive period of the underlying right upon which the claim is premised. *Knox,* 551 F. Supp. 2d at 510-12 (holding that a four-year prescriptive period applied to § 1983 claims premised on post-employment rights protected by § 1981) (citing *Mitchell,* 265 F. App'x at 367); *Charles v. Galliano,* 2010 WL 3430519, *4 (E.D. La. 2010); *Thomas v. City of Shreveport,* 2008 WL 4291211, *4-5 (W.D. La. 2008); *Baker v. Birmingham Board of Education,* 531 F.3d 1336, 1338 (11th Cir. 2008). In other words, if the Plaintiff's § 1983 action is premised on a claim that would provide a four-year prescriptive period, the § 1983 claim will also be subject to a four-year prescriptive period.

In her opposition, Plaintiff asks the Court to extend interpretations of Section 1983 to Section 1985. Specifically, she asserts that her Section 1985 claims are premised on violations of her Section 1981 rights alone, and, therefore, the four-year

prescriptive period applicable to post-employment Section 1981 claims should be applied to her Section 1985 claim. (Doc. 41, at 15-16); *Knox*, 551 F. Supp. 2d at 512 (holding that post-employment claims, like demotion and termination, are subject to a four-year prescriptive period because, unlike pre-employment claims actionable under Section 1981 before 1990, post-employment claims were not actionable until the 1991 Civil Rights Act was promulgated).[13] While the Court acknowledges the unique similarities between Section 1983 and Section 1985, it cannot apply the Plaintiff's requested analogy here. In her complaint, Plaintiff does not make clear that her Section 1985 claims are premised on Section 1981 violations alone. (Doc. 1, at 9).[14] Instead, Plaintiff merely asserts that "Defendants conspired to deprive Complainant of equal protection under the law," and, throughout the complaint, federally-protected rights to equal protection outside of Section 1981 are referenced.

---

[13] The Eleventh Circuit has suggested that § 1981 claims are not rights that can be properly asserted through § 1985. *Jimenez v. Wellstar Health System*, 596 F.3d 1304, 1312. The court noted:

> This Circuit has routinely and systematically grouped Title VII and § 1981 claims for analytic purposes. *See, e.g., Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir.1998) (analyzing Title VII and § 1981 claims concurrently because of their similarity). Thus, because conspiracies to violate rights protected by Title VII cannot form the basis of § 1985(3) suits, *Novotny*, 442 U.S. at 378, 99 S.Ct. at 2352, and because the Supreme Court has been conservative in designating which rights litigants may enforce against private actors under § 1985(3)**,** we hold conspiracies to violate rights protected under § 1981 are likewise insufficient to form the basis of a § 1985(3) claim. Further, even if interference with contract and property rights could sustain a § 1985(3) claim, Jimenez has not adequately pled interference with any such rights here. *See supra*, Part III.A. The district court, therefore, did not err in ruling Jimenez failed to state a claim under § 1985(3).

*Id. See also, Brown v. Phillips Morris, Inc.*, 250 F.3d 789, 807 (3d Cir. 2001). While the Court recognizes this sound analogy, it is not prepared at this time to adopt this precedent without guidance from the Fifth Circuit.

[14] This limitation is articulated clearly for the first time in Plaintiff's opposition. (Doc. 41, at 15-16).

(Doc. 1, at 7-9).[15] Without more specific pleadings, the Court cannot break from a long line of precedent that has applied a one-year prescriptive period to a Section 1985 claim. *See Smith v. Humphrey,* --- F. App'x ---, 2013 WL 5306676, *1 (5th Cir. 2013); *Mitchell,* 265 F. App'x at 367; *Jones v. Orleans Parish School Board,* 679 F.2d 32, 36, n.4 (5th Cir. 1982); *Lagarde,* 2012 WL 4482981, at *3.

Finally, the Court is required to determine the act which triggered the commencement of Plaintiff's one-year prescriptive period. While state law controls the prescriptive period that applies, federal law determines when a cause of action accrues. *Helton,* 832 F.2d at 334-35. Under federal law, a cause of action accrues when the plaintiff knows or has reason to know of the injury that forms the basis of the action. *Helton,* 832 F.2d at 334-35. Specifically, the prescriptive period begins to run as soon as "the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Id.* The Court concludes that Plaintiff had the requisite knowledge to meet this standard on March 23, 2010, when she was allegedly told she was being demoted and transferred because of her race. (Doc. 1, at 3). However, at the very latest, this knowledge requirement was satisfied upon her actual transfer to Plaquemine High School in June 2010. (Doc. 1, at 4). In either instance, Plaintiff's Section 1985 claim is time-barred, as she did not file suit until August 24, 2011, more than a year later. Thus, the Motion for Partial

---

[15] Paragraphs 20, 22, and 23 make reference to Plaintiff's rights protected by the First and Fourteenth Amendments (Doc. 1, 7-9).

Summary Judgment on this claim is GRANTED and all Section 1985 claims against the Defendants are dismissed.

### E. Claims against Cancienne and Lodge in their Official Capacities

The Defendants contend that Cancienne and Lodge cannot be held liable in their official capacities because the claims are duplicative of claims against the IPSB.[16] Plaintiff does not put forth any specific legal argument to refute this contention, but she nonetheless asserts that Cancienne and Lodge can be held liable in their official capacities.

"Official-capacity suits … 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55 (1978)). "Actions for damages against a party in his official capacity are, in essence, actions against the governmental entity of which the officer is an agent." *J.D. v. Georgetown ISD School Dist.*, 2011 WL 2971284, at *4 (W.D. Tex. 7/11/2011) (citing *Familias Unidas v. Briscoe*, 619 F.2d 391, 403 (5th Cir. 1980)). Courts have recognized situations where claims against individual defendants in their official capacities must be dismissed because the claims are duplicative of those brought against a government entity. In *J.D. v. Georgetown*, the plaintiff brought suit against the Georgetown ISD School District and against the President of the School Board for retaliation pursuant to Section 504 of the

---

[16] The Defendants direct the Court to *Moton v. Wilkinson*, 2009 WL 498487, *1 (E.D. La. 2/26/09) (citing *Smith v. Amedysis, Inc.*, 298 F.3d 434, 449 (5th Cir. 2002) and *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 262 (5th Cir. 1999)).

Rehabilitation Act and the Americans with Disabilities Act. *Id.* at *1. The Court found that a suit against the President of a School Board in his official capacity was redundant of the suit against the School Board itself, and dismissed the claim against the President. *Id.* at 4. Here, Plaintiff asserts the same claims against Canciennce and Lodge in their official capacities as she does against the IPSB itself. The Court agrees with the rationale set forth in *J.D. v. Georgetown*, and concludes that the same result should apply in this case. The Motion for Partial Summary Judgment on this claim is GRANTED.

### F. Punitive Damages Claim

The Defendants next contend that the IPSB, as a local governmental entity, cannot be held liable for punitive damages under Section 1981 or Section 1983.[17] Specifically, they argue that because Plaintiff asserts her Section 1981 claims through Section 1983, the IPSB should not be liable for punitive damages under either statute. Plaintiff does not contest this argument, but she asserts that individual public officers can be held liable for punitive damages under Section 1983.[18] She also asserts that the Defendants do not argue for the dismissal of punitive damages claims against Cancienne and Lodge and, therefore, such claims should remain.

---

[17] The Defendants direct the Court to *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981), *Pemberton v. West Feliciana Parish School Board*, 2010 WL 431572, *9 (M.D. La. 2/3/2010), and *Evans v. St. Bernard Parish School Board*, 2003 WL 22174272, *1 (E.D. La. 9/11/2003).

[18] Plaintiff directs the Court to *Smith v. Wade*, 461 U.S. 30, 35 (1983).

Because Plaintiff has not presented any argument in opposition, the Court will assume that Plaintiff concedes that the law cited by the Defendants is applicable here. Indeed, this Court has already recognized that "[a]s a matter of law[,] punitive damages under § 1983 are not available against a governmental entity such as [a] School Board." *Pemberton v. West Feliciana Parish School Board*, 2010 WL 431572, *9 (M.D. La. 2/3/2010). The Defendants are also correct in pointing out that Plaintiff has sought redress of her Section 1981 claims through Section 1983. *See* Doc. 16. Again, Plaintiff has not presented argument as to why a claim for punitive damages under Section 1981 should survive here. Thus, the Motion for Partial Summary Judgment is GRANTED, and all punitive damages claims under Section 1981 or Section 1983 against the IPSB are dismissed.

Regarding the individual Defendants, Plaintiff is correct in asserting that no argument has been set forth to relieve them from punitive damage liability. However, the Court has already dismissed all claims against Cancienne and Lodge in their individual capacities under Section 1981, and the Court has also dismissed claims against Cancienne and Lodge in their official capacities because they are duplicative of the claims against the IPSB. Thus, as Plaintiff only uses Section 1983 as a vessel through which to assert her 1981 claims, and because her Section 1983 claims are brought against Cancienne and Lodge in their official capacities, there is no reason to maintain a punitive damages claim against Cancienne or Lodge. The Motion for Partial Summary Judgment is GRANTED and any claims for punitive

damages under Section 1981 or Section 1983 against Cancienne and Lodge are dismissed.

### G. Constructive Discharge Claim

The Defendants assert that Plaintiff has no claim for constructive discharge because she was not subject to intolerable work conditions as a Librarian, and that the reason Plaintiff left her employ was to take a job elsewhere (Doc. 35-1, at 28). They direct the Court to Plaintiff's testimony, where she admitted that her work conditions were not intolerable and that she left because she did not like working for a school district that discriminated against her (Doc. 35-1, at 28). They further assert that, even if Plaintiff claims to have resigned because of the alleged racial discrimination she suffered when she was transferred to the position of Principal of Special Projects in April 2010, Plaintiff did not resign immediately after her transfer and that she continued to work for the School Board for more than a year afterwards (Doc. 35-1, at 29).

Plaintiff, however, contends that "[a]ny reasonable person in [Plaintiff's] shoes would have felt compelled to resign" (Doc. 41, at 24). She claims that she was openly discriminated against; demoted twice; suffered a reduction in pay which affected her retirement; had her job responsibilities reduced; was assigned to menial work; and suffered humiliation and embarrassment because of unlawful actions by the Defendants. *Id.* While courts have found a constructive discharge when a plaintiff meets only one factor, she asserts that she satisfies all of the factors to

establish a *prima facie* case of constructive discharge and that her claims should not be dismissed.

To succeed on a claim of constructive discharge, "an employee 'must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign.'" *Stover v. Hattiesburg Public School Dist.*, 549 F.3d 985 (5th Cir. 2008) (citing *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000). "This objective test has been referred to as the reasonable employee test." *Id.* When making its determination, the court considers various factors including (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not. *Id.* (citing *Aryain v. Wal–Mart Stores Tex. LP*, 534 F.3d 473, 481 (5th Cir. 2008)).

The Court must conclude that Plaintiff was not constructively discharged. After a review of the evidence, the Court finds numerous reasons why Plaintiff cannot establish any of the factors used in consideration of this claim. First, Plaintiff has only presented unsubstantiated evidence that she was discriminated against. Plaintiff claims that Cancienne told her that she was being transferred to Plaquemine High School as Principal of Special Projects because of her race. Yet, the uncontroverted evidence shows that there are at least three different versions of that claim. Testimonial evidence shows that Plaintiff's job performance was questionable

prior to her transfer and that she was experiencing difficulties in her role as Principal. Thus, Cancienne's recommendation that Plaintiff be transferred, despite Plaintiff's belief, does not sound an alarm of suspicion.

Also, Plaintiff's claim that she was "demoted" twice lacks merit. In fact, the only parties who claim that Plaintiff's transfer was a demotion are Plaintiff, Erin Gross, and Darlene Ourso, neither of whom can express more than a lay person's opinion. Plaintiff has not provided evidence of a policy, procedure, or IPSB rule book that support this contention.

Plaintiff's further alleges that she was reduced to performing menial tasks as a Librarian and that she suffered humiliation and embarrassment because of the unlawful actions of the Defendants. Even accepting the facts in the light most favorable to Plaintiff, she has failed to point to evidence showing that she was subjected to intolerable work conditions as a Librarian, or that she was being purposely humiliated or harassed by any of the Defendants. Consequently, Plaintiff has not convinced this Court that she was constructively discharged. The Motion for Partial Summary Judgment is GRANTED and this claim is dismissed against all Defendants.

### H. Intentional Infliction of Emotional Distress Claims

The Defendants assert that Plaintiff's Intentional Infliction of Emotional Distress ("IIED") claims are vague and that she does not point to any specific conduct to support the allegations. Nevertheless, they contend that, should the Court consider any IIED claims, Plaintiff's IIED claim (as the result of her initial

transfer) is barred by prescription, and that there is no evidence to support her IIED claims for being placed on the Plan, for nonrenewal of her contract, or for the denial of the EMT position (Doc. 35-1). Plaintiff does not address these arguments in her Opposition.

Under Louisiana law, to establish a claim for intentional infliction of emotional distress, Plaintiff must satisfy the following elements: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *LaBove v. Raftery*, 00-1394 (La. 11/28/01), 802 So.2d 566, 577 (citing *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991)). Further, extreme and outrageous conduct is conduct described as "so outrageous in character and so extreme in degree that it goes beyond all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Alleman v. State*, 698 F.Supp.2d 644, 667 (M.D. La. 2010) (citing *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991)).

Here, Plaintiff has utterly failed to meet the elements of an IIED claim. Disregarding any argument of prescription, the Court has not found any evidence that Plaintiff was the subject of any extreme and outrageous behavior by the Defendants. As noted, Plaintiff was fully aware that her employment with the IPSB was the subject of a flexible contract that was not guaranteed for renewal. The contract also gave the IPSB authority to transfer, demote, or terminate Plaintiff if it

concluded that such was necessary. Plaintiff signed the contract acknowledging such; thus, she was aware that her employment as a Principal was not always guaranteed.

Moreover, Plaintiff has not shown that the Defendants intended to cause her severe emotional distress, or any distress at all, for that matter. All of the evidence that Plaintiff has asserted to show a conspiracy or malice is completely unsubstantiated. Most importantly, Plaintiff has not shown that she actually suffered severe emotional distress as required by the statute. Under Louisiana law, serious emotional distress includes conditions such as neuroses, psychoses, chronic depression, phobia, and shock. *Held v. Aubert*, 02-1486 (La. App. 1 Cir. 5/9/03), 845 So. 2d 625, 634.   Plaintiff has not pointed to evidence to show that her emotional distress falls anywhere near the realm of the jurisprudential definition. Thus, the Court cannot conclude that a reasonable person would have suffered such *severe* emotional distress that would be actionable under this provision of Louisiana law. The Motion for Partial Summary Judgment on this claim is GRANTED, and this claim is dismissed against the Defendants.

### IV.    Conclusion

Accordingly,

**IT IS ORDERED** that the **Motion for Partial Summary Judgment (Doc. 35)** is **GRANTED**.

**IT IS FURTHER ORDERED** that the claims against Defendants the Iberville Parish School Board, Dr. P. Edward Cancienne, and Mr. Melvin Lodge

outlined herein are dismissed.

Baton Rouge, Louisiana, this 25th day of March, 2014.

_____

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**